# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **TIMOTHY CLARK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **09-40040-FDS** |
| | ) | |
| **RICHARD B. EDISON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## MEMORANDUM AND ORDER ON CROSS-MOTIONS
## TO LIMIT OR EXCLUDE EXPERT TESTIMONY

**SAYLOR, J.**

This is a civil lawsuit for assault and battery arising from childhood sexual abuse. The abuse is alleged to have occurred between 35 and 38 years ago. Jurisdiction is based on diversity of citizenship.

Plaintiff Timothy Clark alleges that between 1974 and 1977, when he was between the ages of 10 and 14, he was repeatedly sexually abused by defendant Richard Edison. Clark contends that he did not recall the abuse until May 2008, when he suddenly recovered memories of it while visiting his mother's grave. This lawsuit was brought in November 2008, more than three decades after the alleged abuse ended.

Ordinarily, such a claim would be barred by the three-year limitations period set forth in Mass. Gen. Laws ch. 260, § 2A. However, in 1993, Massachusetts enacted a statute, ch. 260, § 4C, that provides that a claim for sexual abuse of a minor does not accrue until the victim "discovered or reasonably should have discovered that an emotional or psychological injury or condition was caused by" the abuse. Plaintiff contends that his claim did not accrue until May

2008, and thus the lawsuit was timely filed.

The parties have retained expert witnesses to testify at trial as to the theory of memory repression and recovery as it relates to plaintiff's allegations. Each party has moved *in limine* to exclude the other's expert testimony under Fed. R. Evid. 702 and 403 and the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court held an extended evidentiary hearing on those motions, at which it heard testimony from two psychiatrists and a psychologist. On June 21, 2012, the Court denied both motions, subject to certain limitations. This memorandum sets forth the Court's reasoning for its decisions.

I.      **Introduction**

At the outset, the Court notes that it has deep reservations about the admission of the disputed testimony. This case does not involve a typical subject of expert testimony, such as whether a broken leg was set properly or whether a company was insolvent. The proposed testimony addresses the issue of human memory: how memories are encoded, how they are stored, and how they are recovered. Almost inevitably, it touches directly on the issue of whether those memories are accurate or not, or indeed whether the underlying events occurred at all.

It is no exaggeration to say that our justice system, civil and criminal, is based to a very large extent on the reliability of human memory. Virtually all witness testimony derives from human memory, and normally the core function of the jury is to assess the accuracy and credibility of those memories. The critical issue, therefore, is whether any expert testimony on the subject of memory will unfairly affect the jury's assessment of the facts by bolstering the testimony of a key witness in a way that would otherwise be impermissible.

To complicate matters, the direct study of memory is in many ways impossible, in the sense that the inner workings of the human mind cannot be directly examined. The study of memory relies heavily, if not entirely, on self-reporting by individual patients and subjects. When a person claims to have a lack of memory, or to have lost a memory and then recovered it, there may be no accurate way to test that proposition. At the very least, the type of rigorous testing and analysis required in other sciences is simply not possible.

To make matters worse, the subject arises in the context of an emotionally and politically charged case. It is difficult for anyone to be entirely dispassionate on the subject of child sexual abuse; the conduct is of course repugnant, and our natural instincts are to be strongly protective of the victim. Those same instincts may, however, lead us to forget that those accused of such conduct must also have a fair opportunity to refute the charge. Jurors who are predisposed to favor alleged victims may give undue weight to tenuous evidence if that evidence confirms their pro-plaintiff biases. That risk is particularly acute here, where the confirmatory evidence is in the form of expert testimony that, despite its limitations, may be perceived as representing an endorsement by the scientific community.

Finally, the sparsity of evidence in this case may lend undue weight to the expert testimony. Because of the passage of time, the critical evidence in this case consists almost entirely of uncorroborated memory—that is, complainant testimony, with no confirming medical or scientific evidence—and some of the key witnesses have long since passed away. It is, of course, of great importance that the law give victims of abuse an opportunity to vindicate their rights in court. But that consideration does not obviate the policies that lie behind all limitations on plaintiffs' right to sue. As the Supreme Court has explained, "[m]emories fade, and witnesses

can die or disappear.  Such problems can plague child abuse cases, where recollection after so many years may be uncertain, and 'recovered' memories faulty . . . ."  *Stogner v. California*, 539 U.S. 607, 631 (2003).  The challenges of discerning fact from allegation years after the events at issue have occurred are so great that statutes of limitations bar actions in almost all other contexts.  Those challenges require equal consideration here, even though the alleged misconduct is highly reprehensible.

In short, and at a minimum, the proposed testimony should be subject to close and exacting scrutiny.  After careful consideration, and despite substantial misgivings, both motions to exclude expert testimony on this topic will be denied.  The experts will be permitted to testify regarding memory repression theory, its limitations, its level of acceptance in the scientific community, and the characteristics likely to be present in individuals who have experienced repressed memory.  However, neither expert may testify as to their personal beliefs regarding the ultimate issues in this case—that is, whether plaintiff suffered from the alleged abuse and whether he repressed his memories of the experience before 2008.

## II.    Background

### A.    Factual Background

Timothy Clark was born in 1963.  After his parents divorced, he lived with his mother and his two brothers, Michael and David Clark.  In 1974, when he was ten years old, the Clarks lived in Shrewsbury, Massachusetts, in an apartment complex known as Shrewsbury Gardens.

Richard Edison also resided at Shrewsbury Gardens in 1974.  At the time, he was a medical student at the University of Massachusetts in Worcester.  The Clark brothers knew Edison and would visit his apartment and listen to music with him.  Clark alleges that Edison

provided the children with marijuana and on multiple occasions took Timothy into his bedroom, alone, and sexually abused him.

In 1975, the Clark family moved to an apartment in a complex known as Brandywine Village. Edison also moved to Brandywine Village during that year, and the Clark children continued to visit him there despite their mother's objections. Clark alleges that Edison continued to abuse him sexually during that period.

At some point, the Clark family moved to a new apartment at Lincoln Village in Worcester. According to Clark, Edison continued to associate with the boys. In 1977, their mother filed a "disturbing the peace" complaint against him in Massachusetts District Court. Timothy went to court with his mother for a hearing on that matter, but he was taken outside of the courtroom for much of the proceeding. The action was dismissed, and no criminal prosecution occurred. However, the court ordered Edison to cease his interactions with the children, and they had no further contact with him.

Clark turned 18 in 1981. He contends that for many years he retained no memory of the sexual abuse. However, he asserts that in May 2008, he experienced a sudden flood of memories while visiting his mother's grave with his brother Michael. These memories included episodic visions of his interactions with Edison and explicit memories of sexual contact. In the months following that experience, Clark suffered emotional reactions to the memories. He received psychological therapy from Erik D. Nelson, who identified symptoms of post-traumatic stress disorder that he believed were derived from childhood sexual abuse.

B.   **Legal Background**

Clark filed a complaint on November 24, 2008. The complaint asserts a single cause of

action, that of assault and battery under Massachusetts common law.

Mass. Gen. Laws ch. 260, § 4C provides that "the time limit for commencement of an action [for assault and battery alleging the defendant sexually abused a minor] is tolled for a child until the child reaches eighteen years of age." *Id.* The same statute delays the accrual of such a cause of action until "the victim discover[s] or reasonably should [discover] that an emotional or psychological injury or condition was caused by" the abuse. *Id.*[1] Thus, the statute's three-year limitations period for assault and battery does not begin to run until the potential plaintiff has "first, an awareness of [his] injuries and, second, an awareness that the defendant caused [his] injuries." *Doe v. Creighton*, 439 Mass. 281, 283 (2003).[2]

With respect to both elements, a plaintiff who files suit more than three years after reaching maturity must demonstrate both that he actually lacked awareness and that his lack of awareness was objectively reasonable. *Id.* The objective reasonableness of a plaintiff's lack of knowledge is determined from the perspective of "a reasonable person who has been subjected to the conduct which forms the basis for the plaintiff's complaint." *Riley v. Presnell*, 409 Mass. 239, 245 (1991). That analysis focuses "on the nature of the abusive conduct, the injuries that the abuse inflicted, and the effect that both would have had on the causal understanding of an ordinary, reasonable person." *Creighton*, 439 Mass. at 284.

---

[1] In enacting the statute, the Massachusetts legislature extended a common-law discovery rule that Massachusetts courts apply with respect to other causes of action in tort. *Doe v. Creighton*, 439 Mass. 281, 283 (2003). Under the common-law rule, a claim does not accrue as long as the underlying facts that give rise to it remain "inherently unknowable," a standard that is "no different from, and is used interchangeably with, the 'knew or should have known' standard." *Williams v. Ely*, 423 Mass. 467, 474 n.7 (1996); *see also Saenger Org., Inc. v. Nationwide Ins. Licensing Assoc., Inc.*, 119 F.3d 55, 64 (1st Cir. 1997).

[2] Edison previously moved for summary judgment on the grounds that Clark's claim was time-barred under Mass. Gen. Laws ch. 260, § 4C. On January 24, 2012, the Court denied that motion on the grounds that there were material factual disputes as to when the cause of action accrued.

Courts have recognized the potential applicability of the statutory discovery rule where a plaintiff alleges that some psychological process prevented him from becoming aware of an alleged abuse until the memory was suddenly recovered years later. *See, e.g.*, *Hoult v. Hoult*, 792 F. Supp. 143, 145 (D. Mass. 1992) (denying summary judgment where plaintiff asserted that she had no memory of sexual abuse until after the otherwise-applicable limitations period).[3]

## III. Analysis

### A. Rules 702 and 403 Generally

Both parties have, in substance, cross-moved to exclude the other side's expert testimony on the subject of repressed memory. Whether that testimony may be admitted is governed principally by two rules of evidence: Rules 702 and 403.

Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

_____

[3] The discovery rule may also delay accrual where a victim who remembers being sexually abused nonetheless lacks knowledge of his injury because he "was not aware that he had suffered any appreciable or legally recognizable harm." *Ross v. Garabedian,* 433 Mass. 360, 366 (2001) (internal quotation omitted). Similarly, for purposes of the rule, even a plaintiff who is aware that misconduct is wrong may remain unaware of the causal connection between that misconduct and subsequent emotional or psychological injuries. *See Riley*, 409 Mass. at 246 (noting that psychological damage from sexual abuse is an "injury to the mind" that "by its very nature prevents the discovery of its cause"); *Creighton*, 439 Mass. at 285; *Armstrong v. Lamy*, 938 F. Supp. 1018, 1038 (D. Mass. 1996). Here, plaintiff asserts that he lacked any memory of the alleged abuse, not that he failed to recognize a causal connection.

Fed. R. Evid. 702. The adoption of Rule 702 in its present form codified the standard of admissibility for expert testimony that was set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).

Under Rule 702, district courts considering the admissibility of scientific testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting *Daubert*, 509 U.S. at 597). This gatekeeping function requires that the Court consider three issues: (1) whether the proposed expert is qualified by "knowledge, skill, experience, training or education;" (2) whether the subject matter of the proposed testimony properly concerns "scientific, technical, or other specialized knowledge;" and (3) "whether the testimony [will be] helpful to the trier of fact, i.e., whether it rests on a reliable foundation and is relevant to the facts of the case." *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1997).

The requirement that an expert's testimony must be based on a reliable scientific foundation is often the "central focus of a *Daubert* inquiry." *Ruiz-Troche*, 161 F.3d at 81. In *Daubert*, the Supreme Court enumerated a non-exhaustive list of factors that a court may consider in undertaking its reliability analysis: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known rate of error; (4) whether there are standards controlling its application or operation; and (5) whether it is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *see also Samaan*, 670 F.3d at 31-32.

In evaluating whether expert testimony will be helpful to the trier of fact, the Court must

determine whether it is relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche*, 161 F.3d at 81 (citing *Daubert*, 509 U.S. at 591-92). In other words, Rule 702 requires the court to "ensure that there is an adequate fit between the expert's methods and his conclusions." *Samaan*, 670 F.3d at 32 (citing *Daubert*, 509 U.S. at 591. *See also Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000) (describing the "ultimate purpose of the Daubert inquiry" as determining the testimony's helpfulness to the jury).

The focus of the Rule 702 inquiry is on the principles and methodology employed by the expert, not the ultimate conclusions. *Daubert*, 509 U.S. at 595. The court may not subvert the role of the fact-finder in assessing credibility or in weighing conflicting expert opinions. Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. *See also Ruiz-Troche*, 161 F.3d at 85 (admitting testimony notwithstanding a lack of peer-reviewed publications because the opinion rested upon good grounds generally and should be tested by the "adversarial process").

Expert scientific testimony that is admissible under Rule 702 may nonetheless be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. *See also Daubert*, 509 U.S. at 595. Thus, expert testimony that is relevant and that passes muster from a scientific standpoint may nonetheless be excluded if it is likely to be misinterpreted or misused by the jury.

**B.** **Testimony at Evidentiary Hearing**

This dispute concerns the admissibility of testimony by two proposed expert witnesses: plaintiff's expert, Dr. James W. Hopper, and defendant's expert, Dr. Harrison G. Pope, Jr. The Court held an evidentiary hearing at which it heard testimony from Dr. Pope and Dr. Hopper concerning the scientific reliability of repressed-memory theory. The Court also heard testimony from Dr. James A. Chu, a psychiatrist called by plaintiff.

**1.** **Dr. James W. Hopper**

Dr. Hopper is a clinical psychologist licensed to practice in Massachusetts. He received a B.A. in history from the University of Rochester in 1988 and a Ph.D. in clinical psychology from the University of Massachusetts - Boston in 1997. He has experience treating trauma victims and estimates that he has treated more than 200 patients who were sexually abused as children. He has also conducted research related to post-traumatic stress disorder ("PTSD") and memory-related effects of childhood sexual abuse. One focus of his research has been on brain-imaging studies concerned with biological mechanisms associated with psychological trauma and memory impairments. He is an advisory board member of an organization that provides support to men who were victims of childhood sexual abuse.

Dr. Hopper testified that the theory of repressed-memory was first conceived by Sigmund Freud in the late 19th century. (6/4/2012 Tr. at 42). He explained that modern concepts in the fields of cognitive neuroscience and cognitive psychology have modified psychologists' understanding of what repression is and how it works. (*Id.*). However, he asserted that the fundamental hypothesis—that the mind may suppress memories of a traumatic event so that a person cannot freely recall those memories—is accepted by many psychologists today. (*Id.* at

42-43).  He defined the phenomenon of "recovered memory" as a "memory of an episode that [individuals] have experienced in their life that they believe they have not retrieved for a very long time."  (*Id.* at 27).[4]  Dr. Hopper estimated that, of the roughly 200-300 patients he has treated who were sexually abused as children, more than fifty of them had experienced such a recovery of previously repressed memories at some point.  (*Id.* at 24).

Dr. Hopper also testified that the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR"), recognizes a diagnosis called "dissociative amnesia."  (*Id.* at 30-36).[5]  He summarized the diagnosis as consisting of (1) a reversible memory impairment that prevents a person from consciously recalling certain personally significant memories (usually of traumatic experiences) and (2) clinically significant distress that results from that impairment.  (*Id.* at 34-36).  Dr. Hopper testified that the manual's recognition of dissociative amnesia reflected a general consensus within the psychiatric community that a person may experience a reversible memory loss that is too extensive to be explained by ordinary mechanisms.  (*Id.* at 35).  He added that although some persons disagree, the diagnosis is widely accepted by experts in the field.  (*Id.*).

When asked what distinguishes diagnosable dissociative amnesia from ordinary human

---

[4] During the hearing, all three experts agreed that the scientific literature on the issues raised in this case uses inconsistent terminology.  They distinguished the use of certain terms (for example, "repressed memory," "recovered memory," and "dissociative amnesia") to *describe* a phenomenon from their use to identify a psychological or biological mechanism to *explain* that phenomenon.  Here, the court will use the term "repression" to refer to the phenomenon that the plaintiff must prove to benefit from the statutory discovery rule in this case.

[5] The DSM is published by the American Psychiatric Association.  It is a classification manual widely used by mental health professionals in making diagnoses of mental health problems.  The DSM lists criteria for a clinician to consider when making a particular diagnosis.  The most recent edition, DSM-IV, was published in 1994.  In 2000, a text revision of the DSM-IV, the DSM-IV-TR, was released.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at xxxiii (4th ed. text rev. 2000).  The Fifth Edition of the manual is currently under development.  *See DSM-5 Development Home*, American Psychiatric Association DSM-5 Development, http://www.dsm5.org/Pages/Default.aspx (last visited June 29, 2012).

forgetfulness, Dr. Hopper rejected what he called a "false dichotomy" between the two. (*Id.* at 50-53). He suggested that "[t]here's no simple thing called ordinary human forgetfulness. There are a whole bunch of mechanisms and processes by which people can forget things and retrieve them . . . . It's a matter of degrees; it's a matter of context." (*Id.* at 53). Different individuals, he explained, have different "capacities to block" memories. (*Id.*). Finally, he rejected the assumption that a person must meet the diagnostic criteria for dissociative amnesia as defined in the DSM-IV-TR to be experiencing substantial memory impairments as a result of childhood trauma. (*Id.*).

Dr. Hopper indicated that some of the theories to which he was testifying are reviewed in a book by Daniel Schacter, a neuroscientist at Harvard. (*Id.* at 69-70).[6] He testified that Schacter describes a concept known as "directed forgetting," by which a person may intentionally suppress a memory that he does not want to remember until it becomes inaccessible to his conscious mind without an external cue. (*Id.* at 71). Dr. Hopper also identified a 2009 scientific article as one of several recent studies that have suggested potential brain mechanisms that could operate to keep an unwanted memory out of a person's conscious awareness. (*Id.* at 81-82).[7] He acknowledged that repressed-memory theory has been criticized for its reliance on the self-reported accounts of research subjects concerning internal mental processes that cannot be objectively verified. (*Id.* at 98-99). However, he asserted that self-reporting is an accepted

---

[6] DANIEL L. SCHACTER, THE SEVEN SINS OF MEMORY: HOW THE MIND FORGETS AND REMEMBERS (2001).

[7] Michael C. Anderson & Benjamin J. Levy, *Suppressing Unwanted Memories*, 18 CURRENT DIRECTIONS IN PSYCHOL. SCI. 189 (2009). *See also* Karl-Heinz Bauml et al., *Binding and Inhibition in Episodic Memory– Cognitive, Emotional, and Neural Processes*, 34 NEUROSCIENCE & BIOBEHAVIORAL REV. 1047 (2010); Tony W. Buchanan, *Retrieval of Emotional Memories*, 133 PSYCHOL. BULL. 761 (2007); E. Geraerts et al., *Recovered Memories of Childhood Abuse: Current Findings and Their Legal Implications*, 13 LEGAL & CRIM. PSYCHOL. 165 (2008).

methodology in the field of psychological research. (*Id.* at 108). Moreover, he argued that some studies have correlated directly observed brain activities that may operate to suppress unwanted thoughts with individuals' self-reported periods of memory lapse. (*Id.* at 99-100).

Dr. Hopper endorsed the conclusions of a 2006 article by Constance Dalenberg and a 1999 article by Daniel Brown, both of which address the role of repressed-memory theory in the courts. (*Id.* at 102-107).[8]  He testified that the articles demonstrate that the criteria for admissibility under Fed. R. Evid. 702 favor admitting testimony on memory repression in cases such as this one. (*Id.*).  When asked to describe a properly designed study that would test the existence and accuracy of repressed memories, he identified a 1995 prospective study by Linda Williams in which women with documented histories of childhood sexual abuse appeared not to remember the abuse when questioned several years later. (*Id.* at 107).[9]

### 2.     Dr. Harrison G. Pope, Jr.

Dr. Pope is a licensed psychiatrist and professor of psychiatry at Harvard Medical School.  Although Dr. Pope has treated patients who report memory problems, the focus of his work is on research.  He has co-authored several articles that review published studies on repressed memory for purposes of clarifying the state of scientific knowledge on the topic.[10]  He

---

[8] Constance Dalenberg, *Recovered Memory and the Daubert Criteria: Recovered Memory as Professionally Tested, Peer Reviewed, and Accepted in the Relevant Scientific Community*, 7 TRAUMA, VIOLENCE, & ABUSE 274 (2006); Daniel Brown et al., *Recovered Memories: The Current Weight of the Evidence in Science and the Courts*, J. OF PSYCHIATRY & L., vol. 27, Spring 1999, at 5.

[9] Linda M. Williams, *Recovered Memories of Abuse in Women with Documented Child Sexual Victimization Histories*, 8 J. OF TRAUMATIC STRESS 649 (1995).

[10] *See, e.g.,* Harrison G. Pope, Jr. & James I. Hudson, *Can Memories of Childhood Sexual Abuse Be Repressed?*, 25 PSYCHOL. MED. 121 (1995); Harrison G. Pope, Jr. et al., *Attitudes Toward DSM-IV Dissociative Disorders Diagnoses Among Board-Certified American Psychiatrists*, 156 AM. J. PSYCHIATRY 321 (1999); Pope & Hudson, *Repressed Memories: Scientific Status, Modern Scientific Evidence, in* 2 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY 20 (West 2011-2012 ed.).

has testified on the subject in courts across the country.

At the outset of his testimony, Dr. Pope acknowledged that he agreed with "80 or 90 percent" of what Dr. Hopper said, but that he disagreed as to a "critical" portion that remained. (6/6/2012 Tr. at 12). In his words,

> I would certainly agree . . . that we lose our memory for things and then at some later date we get reminded of it, and the memory comes back to us. I would certainly agree that we often try to block out or not think about unpleasant or miserable or traumatic memories. I would certainly agree that there has been a lot of scientific research on—on memory and people . . . making an effort to try to not think about things . . . . [The] 10 percent sort of comes down actually to . . . whether there was some process over and above ordinary human experience that would—that would postulate that someone . . . would become literally unable to remember a traumatic event for many years or decades, over and above these ordinary processes that we all experience of forgetfulness and blocking out of unpleasant memories.

(*Id.* at 12-13).

Dr. Pope proceeded to elaborate on the types of memory impairment that he believed to be generally accepted among all scientists. He classified those impairments as (1) ordinary forgetfulness, (2) biological amnesia (including loss of memories of early-childhood memories due to brain development and amnesia due to head injuries and alcohol intoxication), (3) incomplete encoding due to focus on particular details (for example, a victim of an armed robbery might remember the type of gun used but not the assailant's appearance), (4) global amnesia (by which an individual loses all memories from a portion of their life), and (5) behavior that is erroneously diagnosed as "amnesia" (for example, deliberate non-disclosure). (*Id.* at 23-27). In contrast to these forms of memory loss, Dr. Pope defined "repressed memory" as the hypothesis "that you would become literally unable to remember an entire traumatic event . . . but nevertheless, at some later date, you might somehow regain [the] ability to recover [that]

previously inaccessible memory." (*Id.* at 28).[10]  He asserted that "there is no sound scientific evidence" of a psychological process that would fit that definition.  Phenomena that others attribute to memory repression, he suggested, may be accounted for by the five well-recognized forms of amnesia that he described, without hypothesizing some mechanism "over and above ordinary human experiences." (*Id.* at 17).

Dr. Pope next testified that repressed-memory theory is not generally accepted in the scientific community.  With respect to the apparent recognition of the theory in the DSM-IV-TR, he asserted that "dissociative amnesia" is an ambiguous term that may be used to describe many forms of memory impairment, including, for example, incomplete encoding, global amnesia, and pseudoneurological amnesia. (*Id.* at 35).  He cautioned that repressed-memory theory should not be equated with the concept of dissociative amnesia, and that recognition of the latter in the DSM-IV-TR does not imply scientific acceptance of the former. (*Id.* at 31).  Treating the DSM-IV-TR diagnosis for dissociative amnesia as evidence that the scientific community accepts repressed-memory theory, he warned, would be analogous to assuming that because scientists recognize the existence of equine animals, they therefore believe in unicorns. (*Id.*).

Dr. Pope provided a list of 33 scientific publications in which authors have questioned the validity of the theory of repressed memory. (*Id.* at 37-40).[11]  To demonstrate that scientific

---

[10] Dr. Pope clarified that he used the term "repressed memory" not in the "narrow Freudian sense of some hypothetical process where something is driven down into the unconscious mind." (*Id.* at 21-22).  Rather, his definition reflected his understanding of how the word is generally use by the public and by the courts. (*Id.*).

[11] *See, e.g.*, G.S. Goodman et al.*, A Prospective Study of Memory for Child Sexual Abuse: New Findings Relevant to the Repressed-Memory Controversy*, 14 PSYCHOL. SCI. 113 (2003) (noting that its findings "do not support the existence of special memory mechanisms unique to traumatic events, but instead imply that normal cognitive operations underlie long-term memory for [childhood sexual abuse]"); John F. Kihlstrom, *An Unbalanced Balancing Act: Blocked, Recovered, and False Memories in the Laboratory and Clinic*, 11 CLINICAL PSYCHOL. SCI. & PRAC. 34 (2004) ("[R]esearch on actual victims has produced hardly a shred of evidence for psychogenic amnesia covering the traumatic event itself."); August Piper et al., *What's Wrong with Believing in Repression?: A Review for Legal Professionals*, 14 PSYCHOL. PUB. POL'Y & L. 223 (2008) ("Repressed- and recovered-memory theory is not

interest in memory repression has declined, he testified that he has counted the number of

scientific articles in a computerized medical index that mentioned "repressed memory" for each

year between 1984 and 2003.[12]  The count revealed a spike in references to the phenomenon in

the mid-1990s, after which the number fell by roughly four-fifths by the early 2000s.  (*Id.* at 40-

41).  Finally, Dr. Pope testified that brain-imaging studies, biochemical studies, and laboratory

studies in which subjects are asked to memorize word lists and subsequently suppress them are

irrelevant to whether repressed-memory theory is generally accepted.  (*Id.* at 41-43).  Because

those studies merely reveal biological mechanisms related to memory that might, hypothetically,

cause a person to experience memory repression with respect to traumatic experiences, they do

not provide evidence that any individuals actually do forget such events.  (*Id.*).  Dr. Pope

clarified that he was "not claiming that every single scientist in the world rejects recovered

memory" but only that "a large number of prestigious scientists do . . . ."  (*Id.* at 40).

Dr. Pope also testified that he has reviewed 77 studies involving more than 11,000

individuals with various traumatic experiences, such as survivors of the holocaust or natural

disasters.  (*Id.* at 55).  Of those, he asserted, not a single individual was reported to have

experienced a period of repression during which he or she did not remember the experience.

(*Id.*).

As to the testability of the repressed-memory hypothesis, Dr. Pope next explained what,

in his view, a scientifically valid study supporting the theory of repressed memory would

---

supported by science."); Richard J. McNally & Elke Geraerts, *A New Solution to the Recovered Memory Debate*, 4
PERSP. IN PSYCHO. SCI. 126 (2009) ("The repression interpretation does not withstand empirical scrutiny . . . .").

[12] *See* Harrison G. Pope, Jr. et al., *Tracking Scientific Interest in the Dissociative Disorders: A Study of
Scientific Publication Output 1984–2003*, 75 PSYCHOTHERAPY & PSYCHOSOMATICS 19 (2006).

require.  Such a study, he contended, would involve (1) a large group of subjects, each of whom is documented to have experienced a type of traumatic experience; (2) an interview of each subject within a year of that event, in which the victims are asked whether they remember the event and at least some say that they do not; and (3) follow-up interviews of those who claimed that they did not remember the experience, in which the interviewer describes the traumatic events to ensure that the interviewee is actually *unable* to recall the memory.  (*Id.* at 56-57).  He asserted that no published study that has purported to provide evidence of repressed memory—whether retrospective or prospective in experimental design—meets those criteria. (*Id.*).[13]  Of the studies that have claimed to document memory repression, Dr. Pope dismissed the retrospective studies because they relied on interviews in which the subjects self-reported their belief that there had been periods earlier in their lives when they had been unable to access the memory.  (*Id.* at 58-59).[14]  As for prospective studies, Dr. Pope criticized their failure to document the original traumatic event adequately and to exclude alternative possible causes of the apparent amnesia.  (*Id.* at 62-64).  Without evidence that satisfies these standards of scientific rigor, he argued, proponents of the theory have not met their burden as scientists to provide affirmative evidence in support of their hypothesis.  (*Id.* at 54).

Finally, Dr. Pope warned against applying the diagnostic standards contained in the DSM-IV-TR in court (especially the diagnosis for dissociative amnesia) because the manual was

---

[13] Retrospective studies that are cited in support of repressed-memory theory have involved subjects who claimed that at the time of the study they remembered being abused during childhood and, further, that there was a period between that abuse and the time of the study when they lost the ability to remember the experience.  (*Id.* at 58-60).  In prospective studies, a group of individuals who have been victims of a documented traumatic events years before the study took place have been asked whether they remember experiencing any traumatic event of the same nature.  (*Id.* at 61).

[14] Dr. Pope referred to those studies as employing a "do-you-remember-that-you-forgot" methodology.  (*Id.* at 134).

designed for therapeutic, not forensic, purposes. (*Id.* at 71). He indicated that the introduction to the DSM-IV-TR itself contains cautionary language stating that its use in legal settings may result in errors if the significance of the manual's diagnostic definitions is not properly understood by the decision-maker. (*Id.*). He added that Dr. Robert Spitzer, a psychiatrist who served on the editorial board for the DSM-IV-TR, was, like Dr. Pope, a signatory on an amicus brief filed with the Massachusetts Supreme Judicial Court that urged it to exclude concepts such as "repressed-recovered memories" or "dissociative amnesia" from legal proceedings. (*Id.* at 70).

### 3. Dr. James A. Chu, M.D.

Dr. Chu is a licensed psychiatrist and associate professor of psychiatry at Harvard Medical School. He is a practicing clinician at McLean Hospital and has more than 30 years of experience in the diagnosis and treatment of adults who have been seriously traumatized as children. He has received numerous professional awards and distinctions for his work in the field of post-traumatic and dissociative disorders. He was a member of the task force that was responsible for dissociative disorders during the preparation of the DSM-IV.

Dr. Chu testified regarding the inclusion of dissociative amnesia as a diagnosis in the DSM-IV-TR. He explained that the diagnosis was first recognized in the Third Edition of the DSM, which was published in 1980. (6/8/2012 Tr. at 3). Although the earlier edition referred to the disorder as "psychogenic amnesia," the diagnosis had essentially the same criteria. (*Id.*). He testified that the continued inclusion of a diagnosis for the disorder in the DSM-IV-TR was not controversial, and that what debate did occur among members of the task force focused on the decision to change its name. (*Id.* at 7).

As to the significance of a diagnosis for dissociative amnesia in the DSM-IV-TR, Dr. Chu testified that although the DSM-IV-TR is a diagnostic tool, it is used for other purposes, as well. (*Id.* at 7-8). For example, recognition of a psychological or behavioral pattern in the manual legitimizes that disorder for purposes of defining health-insurance coverage and health-policy studies. (*Id.* at 8). In general, he explained, diagnoses in the manual do not address the mechanisms by which diagnosable symptoms arise. (*Id.* at 10). Instead, they provide a common language by which practitioners may categorize types of symptoms and behaviors. (*Id.* at 9).

Dr. Chu testified that dissociative amnesia is not itself a controversial concept among psychiatrists. (*Id.* at 14). He testified that the controversy related to the diagnosis among practitioners does not concern its validity, but the possibility that it may be erroneously diagnosed in cases where therapists' suggestive techniques have caused a patent to "recover" a memory during therapy of an experience that never actually occurred. (*Id.*).[15]

Dr. Chu contended that the list of 33 scientific articles cited by Dr. Pope as critical of repressed-memory theory "looks a lot better than it really is." (*Id.* at 32). According to Dr. Chu, the majority of articles in the list deal with issues related to suggestive therapy, not repression or spontaneous memory recovery; nearly 40 percent of them either are not validated by peer review or lack other indicia of scientific standards; and eight others are authored by a small minority of psychologists, including Dr. Pope himself, who hold "extreme" views on the topic. (*Id.*). Dr. Chu also testified that Dr. Pope's list of 77 studies of trauma victims that failed to report any case of memory repression was less persuasive than Dr. Pope suggested. (*Id.* at 33). He indicated that many of those studies did not focus specifically on childhood sexual trauma, and

---

[15] In this case, plaintiff does not allege that he recovered memories of abuse during therapy, and therefore the issue of therapeutic suggestibility is not directly relevant.

that because the researchers were not testing for amnesiac disorders, they would have had no reason to ask about, or to report, memory repression. (*Id.* at 33). Thus, he concluded, it was unsurprising and insignificant that those studies did not contain scientific evidence to support that theory. (*Id.*).

In sum, Dr. Chu concluded that trauma-related memory disorders are substantially more accepted in the scientific community than Dr. Pope asserted. (*Id.* at 33-37).

C.    **Prior Case Law**

Plaintiff contends that the issue of whether expert testimony on the subject of memory repression is admissible has been settled as a matter of law, and that no further analysis is required. That position is clearly incorrect; admissibility of expert testimony under Rule 702 must be assessed on a case-by-case basis. Indeed, prior legal rulings may no longer reflect valid science:

> Science evolves, and scientific methods that were once considered unassailable truths have been discarded over time. Unreliable testimony based upon those outdated theories and methods must be discarded as well, lest scientific *stare decisis* ensure that such theories survive only in court.

*Shirt v. Hazeltine*, 461 F.3d 1011, 1026 (8th Cir. 2006). Nonetheless, prior decisions applying the *Daubert* standard to the issue of memory repression merit review.

One of the first federal courts to apply *Daubert* principles to memory repression was *Isely v. Capuchin Province*, 877 F. Supp. 1055 (E.D. Mich. 1995). In *Isely*, the court considered two motions *in limine* by the defendant that sought to exclude expert testimony by a clinical psychologist on PTSD and repressed-memory theory. The plaintiff offered the testimony both to prove the underlying allegations and to prove that the applicable statute of limitations was tolled as a result of plaintiff's memory repression. Of the two motions, the first sought exclusion of

testimony on the theories generally, while the second only sought to preclude testimony that the plaintiffs' memories of abuse were credible or that the alleged abuse actually occurred.  The court distinguished the two classes of testimony recognized by the two motions.  Although it found that repressed-memory theory was sufficiently recognized within the field of psychology to warrant testimony about *possible* psychological explanations of plaintiff's behavior, it found that the clinical methodologies at issue offered "no absolute empirical way to prove that (1) an event happened and/or (2) that the memory of it was repressed."  877 F. Supp. at 1066.  The court therefore granted the second motion *in limine* and held that the expert "should not be permitted to testify that she either believes [the plaintiff] or believes that the incidents he alleges occurred . . . ."  *Id.* at 1067.[16]  However, it denied the first motion and allowed the expert to testify as to (1) general tenets of "theories and opinions concerning PTSD and repressed memory" and (2) his opinion as to whether the plaintiff's behavior "is consistent with someone who is suffering repressed memory or post-traumatic stress disorder."  *Id.*

The same year, the First Circuit tangentially addressed the admissibility of repressed-memory testimony to prove allegations of childhood sexual abuse in *Hoult v. Hoult*, 57 F.3d 1 (1st Cir. 1995).  In *Hoult*, the court reviewed an appeal of the denial of a motion by the defendant for relief from judgment based on alleged trial errors.  The court saw no error in the trial court's admission of general testimony on memory repression in cases of sexual trauma, but it did note that the testimony may have, at points, "crossed the line" because the expert "came perilously close to testifying that this particular victim/witness could be believed."  57 F.3d at

---

[16] The court also added that testimony that the plaintiff in fact suffered from PTSD and repressed memory was "subject to Rules 401 and 403 concerning relevance and whether the probative value of the testimony is substantially outweighed by a danger of unfair prejudice to the defendants or whether the testimony could lead to confusion in the minds of the jurors."  *Id.* at 1066.

7.[17]  However, the defendant had not objected at trial or appealed the admission of the evidence directly, and the First Circuit found that any possible error did not rise to the level necessary for relief from judgment under Fed. R. Civ. P. 60(b).  *Id.*

In *Shahzade v. Gregory*, 923 F. Supp. 286 (D. Mass. 1996), a court in this district reached essentially the same conclusion as the court in *Isely*.  In *Shahzade*, the plaintiff alleged that she was sexually abused as a child over the course of a five-year period that ended nearly 47 years before she filed the complaint.  The defendant moved to exclude the testimony of the plaintiff's expert, a psychiatrist who specialized in memory and trauma.  As in *Isely*, the expert testimony was offered both to support the underlying allegations of abuse and to prove memory repression for purposes of avoiding the statute of limitations.[18]  However, unlike in *Isely*, in *Shahzade* the proposed testimony did not include the expert's opinion as to the "elicitation and accuracy of the recovered memory," but merely whether the expert could testify to "the theory itself."  923 F. Supp. at 289.  For purposes of that narrow testimony, the court found "the subject matter, repressed memory syndrome, to be reliable and therefore admissible."  *Id.* at 287.

---

[17] In *Hellums v. Williams*, 16 Fed. Appx. 905 (10th Cir. 2001), the Tenth Circuit granted in part a state prisoner's petition for habeas corpus with respect to convictions that were based in part on expert testimony that similarly crossed the line between admissible "consistent with" testimony and inadmissible testimony concerning another witness's credibility.  During the trial, one expert "consistently made statements in which she assumed the truth of the victim's allegations or affirmatively indicated that the abuse had occurred based on the victim's statements to her."  16 Fed. Appx. at 911.  Another expert exceeded the bounds of admissible expert testimony on the topic when he stated "that he found no reason to question the victim's allegations of sexual abuse."  *Id.*

The Court found that the testimony of those experts "invaded the jury's province."  *Id.*  It explained:  "In abuse cases, experts may testify that an alleged victim suffers from symptoms consistent with sexual abuse . . . .  Experts, however, may not comment on the alleged victim's credibility . . . .  Expert testimony, based on the statements of an alleged victim, that sexual abuse in fact occurred is inadmissible . . . .  Statements that assume the fact of abuse are also inadmissible."  *Id.* at 910 (internal citations omitted).

[18] In *Isely*, the plaintiff asserted that the "episodes [of abuse] had been completely blocked out and that she had no memory of them until she recovered so-called 'repressed memories' of these touchings during psychotherapy in November of 1990."  *Shahzade*, 930 F. Supp. at 674.  Because the Massachusetts legislature had enacted Mass. Gen. L. ch. 260, § 4C in 1993, the court was applying Fed. R. Evid. 702 in the context of the same legal issues that apply in this case.

In 2010, the Massachusetts Supreme Judicial Court considered a criminal defendant's claim that the trial judge erred in admitting expert testimony related to memory repression in *Commonwealth v. Shanley*, 455 Mass. 752 (2010).[18] At trial, the Commonwealth had offered testimony from one expert "to explain the theory, conditions, and symptoms of dissociative amnesia and recovered memory" and from another regarding "the 'fit' of the proposed opinion testimony regarding dissociative amnesia and recovered memory, to the facts of [the] case."[19] *Shanley*, 455 Mass. at 763. After conducting a hearing on admissibility, the trial judge admitted testimony by both experts as well as by the defendant's rebuttal expert. On appeal, the defendant challenged the admission of the first expert's testimony on two grounds. First, he argued that the theory of memory repression was not generally accepted because there is not a sufficient amount of peer-reviewed literature regarding it. *Id.* at 766. Second, he asserted that "the theory is invalid because there does not yet exist a scientific method using experimental design to test for its existence in certain individuals nor are there known error rates or standardization." *Id.* The SJC rejected both arguments, finding that "a wide collection of clinical observations and a survey of academic literature" suggested that repressed-memory theory and dissociative amnesia were based on sufficiently reliable science for testimony on them to be admitted at trial. *Id. See also Commonwealth v. Polk*, 462 Mass. 23 (2012) (reversing criminal conviction and ordering new trial due to exclusion of expert testimony on dissociative memory disorders).

Although there is a split of authority, other state courts have admitted expert testimony

---

[18] The standard for admission of expert testimony under Massachusetts evidentiary rules is substantially the same as under Fed. R. Evid. 702 and *Daubert*. *See Commonwealth v. Lanigan*, 419 Mass. 15, 26 (1994) ("We accept the basic reasoning of the *Daubert* opinion because it is consistent with our test of demonstrated reliability.").

[19] The second of the Commonwealth's experts was Dr. James A. Chu.

on dissociative amnesia, memory repression, and PTSD for purposes of proving that a victim of sexual trauma repressed and then later recovered memory of the abuse. *See, e.g.*, *Keller v. Maccubbin*, 2012 Del. Super. LEXIS 229 (May 16, 2012) (listing decisions of Delaware courts that found expert testimony on repressed-memory theory to be admissible to prove the applicability of a discovery rule); *Logerquist v. McVey*, 196 Ariz. 470, 482 (2000) (reversing an order to exclude testimony on repressed memories for statute-of-limitations purposes); *Wilson v. Phillips*, 73 Cal. App. 4th 250, 252 (Cal. App. 4th Dist. 1999) (affirming the admission of expert testimony on repressed-memory theory for statute-of-limitations purposes); *Doe v. Archdiocese of New Orleans*, 823 So. 2d 360, 363 (La. App. 4th Cir. May 8, 2002) (same); *State v. Ali*, 233 Conn. 403, 434 (1995) (affirming the admission of expert testimony on rape syndrome, including testimony regarding rape victims' tendency to delay reporting).[8]

On the other hand, a substantial number of courts have determined that testimony on repression is not sufficiently reliable under the relevant evidentiary standard. *See, e.g.*, *State v. Quattrocchi*, 1999 WL 284882 (R.I. Super. Apr. 26, 1999) ("The State has not met its burden of establishing that repressed recollection is reliable and admissible as scientific evidence."); *State*

---

[8] *Discepolo v. Gorgone*, 399 F. Supp. 2d 123, 128 (D. Conn. 2005), was an action for sexual assault and intentional infliction of emotional distress in which the plaintiff alleged that the defendant sexually assaulted her multiple times when he babysat for her during the years from 1988 to 1990. *Discepolo v. Gorgone*, 2006 U.S. Dist. LEXIS 68191, at *1-2 (D. Conn. Sept. 12, 2006). Before trial, the defendant moved to exclude the testimony of the plaintiff's treating psychologist that the plaintiff suffered from PTSD and that her behavior (including a delay in reporting the alleged sexual assault) was consistent with that of someone who suffered from PTSD as a result of sexual abuse. *Discepolo*, 399 F. Supp. 2d at 124. Unlike in *Isely* and *Shahzade*, the statute of limitations was not at issue, and the expert's testimony was offered not to prove that the plaintiff in fact repressed the memory but instead to buttress the credibility of her allegations that the abuse actually occurred.

The court admitted the testimony for that purpose, permitting the expert to testify "that the plaintiff suffer[ed] from PTSD, that sexual abuse can be a stressor sufficiently severe to result in PTSD, and that plaintiff's symptoms and behaviors [were] consistent with those of people who have suffered childhood sexual abuse." *Id.* at 130. The court also held, however, that the expert could not "opine on the credibility of plaintiff or offer any opinion that plaintiff in fact suffered the sexual abuse she claims." *Id.*

*v. Walters*, 142 N.H. 239, 246 (1997) ("On the basis of the record before us, we conclude . . . that the indicia of reliability present in the particular memories in [this] case[] do not rise to such a level that they overcome the divisive state of the scientific debate on the issue.").[21]

### D.    Application of Rule 702

#### 1.    Qualifications of the Experts

Plaintiff objects to Dr. Pope's qualifications to render an expert opinion, contending that he does not specialize in trauma-induced memory disorders and otherwise has insufficient training and experience.  However, Dr. Pope's background is amply sufficient to testify knowledgeably on the topic.  He has written several leading articles that contribute to the debate among specialists on whether repressed memory occurs in trauma victims.  If his qualifications are less than complete, that issue is properly addressed on cross-examination, not by excluding the testimony altogether.  *See Mitchell v. United States*, 141 F.3d 8, 15 (1st Cir. 1998) (holding that an expert's lack of specialty practice in the area about which he testified went to the weight of his testimony, not its admissibility).  The Court accordingly concludes that Dr. Hopper and Dr. Pope have sufficient academic and professional credentials to provide expert testimony on the issues in this case.

#### 2.    Scientific Reliability of the Testimony

Consideration of the second requirement for admissibility—that the proffered testimony

---

[21] Another set of state court decisions have, after finding that the scientific basis for repressed-memory theory is inadequate, held that allegations of memory repression are insufficient to toll or delay the running of the applicable statute of limitations.  *Doe v. Maskell*, 342 Md. 684, 698 (1996); *Dalrymple v. Brown*, 549 Pa. 217, 232 (1997); *Travis v. Ziter*, 681 So. 2d 1348, 1355 (Ala. 1996); *Hunter v. Brown*, 1996 WL 57944 (Tenn. Ct. App. Feb. 13, 1996); *S.V. v. R.V.*, 933 S.W.2d 1, 25 (Tex. 1996).

is scientifically reliable—is more complex. The parties each contest the other's proffered testimony as to whether such a theory meets the standard of scientific reliability required by Rule 702.[22] Of the criteria for reliability enumerated in *Daubert*, the primary focus of the parties' motions is on (1) whether the theory of repressed memory is generally accepted in the relevant scientific community, and (2) whether the theory can be, and has been, adequately tested.[23]

As a threshold matter, it is necessary to clarify what the experts' testimony is offered to prove and disprove. Both Dr. Hopper and Dr. Pope began their testimony at the evidentiary hearing by defining "repressed" and "recovered" memory, but their definitions were not the same. Defendant urges that the statutory discovery rule requires that plaintiff prove that he experienced "repressed memory" within the meaning of Dr. Pope's definition—that is, that plaintiff was absolutely unable to remember the alleged abuse until his recovered-memory experience in 2008. (6/6/2012 Tr. at 28). In contrast, plaintiff contends that he must prove only that his experience in 2008 matches Dr. Hopper's definition of a "recovered memory," that is, "a memory of an episode that [an individual has] experienced in [his] life that [he believes he has] not retrieved for a very long time." (6/4/2012 Tr. at 31).

Neither expert's definition precisely captures what a plaintiff must prove to claim the benefit of the statutory discovery rule. Mass. Gen. Laws ch. 260, § 4C provides that a victim's cause of action for childhood sexual abuse accrues at "the time the victim discovered or

---

[22] As previously noted, the Daubert criteria are (1) whether a scientific theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known potential rate of error; (4) whether there exists or are maintained standards controlling its application; and (5) whether it is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *see also Samaan*, 670 F.3d at 31-32.

[23] The Court agrees that those criteria are dispositive in this case and will not address the remaining *Daubert* factors.

reasonably should have discovered that an emotional or psychological injury or condition was caused by" the defendant's alleged misconduct. The statute thus requires that a plaintiff who claims a delayed date of accrual on the theory that he repressed all memory of the abuse must show (1) that during the relevant period he was actually (that is, subjectively) unaware of the abuse or its causal relationship to any emotional or psychological conditions he may have had, and (2) that the lack of awareness was objectively reasonable. *See Hoult v. Hoult*, 792 F. Supp. 143, 145 (D. Mass. 1992).

As to the first element, this standard does not require proof that plaintiff was completely *unable* to remember, regardless of what cues or reminders he experienced. Rather, the discovery rule clearly contemplates the possibility that a victim of abuse who represses memory of it will eventually recover that memory when appropriate cues trigger the memory. However, the statute also requires more than Dr. Hopper's definition suggests, because it is necessary that the plaintiff actually did not consciously remember the experience during the period preceding the memory's recovery.

As to the second element, the objective reasonableness of a plaintiff's failure to discover his cause of action must be understood in relation to the context of the statute. The rule contained in ch. 260, § 4C applies only in actions based on alleged childhood sexual abuse. The inclusion of a discovery rule in that statute alone implies a legislative intent to carve out an exception based on considerations that are specific to, or especially salient in cases of, victims of childhood sexual abuse. Psychological processes that are caused by childhood abuse and that hinder a victim's ability to recognize the causal connection between the abuse and subsequent psychological injuries fit with that type of consideration.

In sum, the admissibility of testimony on repressed-memory theory in a case where a plaintiff alleges total amnesia as to the alleged abuse prior to that memory's recovery depends on the scientific reliability of two postulates. Those are: (1) that a victim of childhood sexual abuse may repress memory of the abuse—such that he has no conscious awareness of it—for a prolonged but finite period, and (2) that such repression is the result of psychological phenomena specific to such abuse and not other types of forgetfulness.

A second threshold consideration is raised by the relationship between the parties' two motions. Because plaintiff has cross-moved to exclude the testimony of defendant's rebuttal expert, Dr. Pope, the issues before the Court includes not only the scientific reliability of repressed-memory theory but also the reliability of Dr. Pope's opinion that the theory is invalid. Although those issues are ostensibly distinct, they are two sides of one coin. As discussed below, the effect of trauma on memory is the focus of heated controversy within the scientific community, and both Dr. Hopper and Dr. Pope espouse views that appear to have some support among scientists engaged in that debate. *Daubert* principles support admission of a scientific theory if it is within "the range where experts might reasonably differ." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999) (citing *Daubert*, 509 U.S. at 596). In other words, where legitimate disagreement exists within the scientific community, it is for the jury, not the judge, "to determine which of several competing scientific theories has the best provenance." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Rule 702 does not require exclusion of all but the most

scientifically supported view, and it clearly contemplates the admission of testimony by experts who have fundamental disagreements about the scientific principles at issue.

Consistently with that principle, the Court could evaluate each expert's testimony separately to decide whether that testimony falls within the range of views in the repressed memory debate that are scientifically supported. However, doing so would undermine the principle purposes of Rule 702—to assist the jury in applying scientific concepts—because admission of either expert's testimony without the other would present a distorted view of the scientific debate. Put another way, it would be meaningless to admit Dr. Pope's testimony, which is in the form of a rebuttal, without that of Dr. Hopper. Conversely, admitting Dr. Hopper's testimony without that of Dr. Pope would disguise the fact that reasonable experts appear to disagree on the topic.[24] The parties' motions therefore rise or fall together.

For the following reasons, the Court finds both that repressed-memory theory is a highly controversial theory and that it nonetheless has sufficient scientific support to be admissible under Rule 702. Accordingly, both experts will be permitted to testify.

### a.     Acceptance in the Scientific Community

Dr. Hopper testified that numerous studies and scientific reviews demonstrate that memory repression is generally accepted among both clinicians and research scientists.[25] In addition, both Dr. Hopper and Dr. Chu asserted that the recognition of dissociative amnesia in the DSM-IV-TR reflects a high degree of acceptance of at least some theories of memory

---

[24] The admission of Dr. Hopper's testimony without that of Dr. Pope would raise similar concerns under Rule 403 because the probative value of hearing one side of the scientific debate in this field might be substantially outweighed by the potential for un-rebutted expert testimony to mislead the jury or confuse the issues.

[25] Williams, *supra* note 8; Dalenberg, *supra* note 7; Brown, *supra* note 7.

repression among psychiatrists.[26]  These considerations weigh in favor of admitting Dr. Hopper's

testimony on repressed-memory theory on the basis of its acceptance in the field.  Defendant

nonetheless argues that memory repression is not accepted in the relevant scientific community

for three reasons.

First, defendant argues that the inclusion of "dissociative amnesia" in the DSM-IV-TR

provides no evidence that the American Psychiatric Association recognizes the theory of

memory repression as to which Dr. Hopper will testify.  Dissociative amnesia, defendant

contends, is a broad concept that includes undisputed causes of amnesia, such as head injuries or

alcohol abuse, so that acceptance of dissociative amnesia does not imply acceptance of

repressed-memory theory.  (*Id.*).  However, both Dr. Chu and Dr. Hopper testified that the DSM-

IV-TR diagnosis reflected psychiatrists' explicit recognition of a form of trauma-induced

temporary memory loss that is distinct—even if only by degree—from other recognized forms of

forgetfulness.  Moreover, the manual defines the basic criterion for dissociative amnesia as "an

inability to recall important personal information, usually of a traumatic or stressful nature, that

is too extensive to be explained by ordinary forgetfulness."  DSM-IV-TR at 519.  It excludes

from the diagnosis memory disturbances that may be attributed to substance abuse, other

amnesia-type disorders, or head injury.  *Id.* at 523.  It therefore appears that recognition of

dissociative amnesia in the DSM-IV-TR weighs in favor of admitting Dr. Hopper's testimony.

_____

[26] *See* DSM-IV-TR at xxxiii ("DSM-IV reflects a consensus about the classification and diagnosis of mental disorders derived at the time of its initial publication.").  Courts that have considered the issue have found that the DSM-IV's diagnosis for dissociative amnesia is persuasive evidence that memory repression is generally accepted within the psychiatric community.  *See, e.g.*, *Isely*, 877 F. Supp. at 1065-66 (admitting testimony on PTSD and repressed-memory theory based in part on diagnosis for PTSD in the DSM-IV); *Shahzade*, 923 F. Supp. at 289 (admitting testimony on repressed-memory theory based on inclusion of dissociative amnesia in the DSM-IV); *Discepolo*, 399 F. Supp. 2d at 127 (finding that "the inclusion of a PTSD diagnosis with the rigor of diagnostic criteria and process for inclusion in the DSM-IV-TR" belied defendant's argument that PTSD was not generally accepted in the relevant community).

Second, defendant argues that testimony concerning the diagnostic criteria for dissociative amnesia should not be admitted because the manual is not generally accepted as a forensic, as opposed to a therapeutic, tool. As Dr. Pope testified during his testimony, the introduction to the DSM-IV-TR warns against the risks of using its diagnostic criteria in a legal setting:

> When the DSM-IV [is] employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis . . . . In determining whether an individual meets a specified legal standard . . . , additional information is usually required about the individual's functional impairments and how these impairments affect the particular abilities in question.

*Id.* at xxxii-xxxiii. However, the reservations expressed in that paragraph do not preclude use of information in the manual to assist the jury in assessing plaintiff's allegations of memory repression. The manual goes on to state that "[t]he use of the DSM-IV in forensic settings should be informed by an awareness of the risks and limitations discussed above. When used appropriately, diagnoses and diagnostic information can assist decision makers in their determinations." *Id.* at xxxiii. The authors of the manual thus do not state that it should not be used for forensic purposes, only that it should be used in such settings with considerable caution and care.

Third, defendant contends that a review of scientific literature shows that repressed-memory theory was a "scientific fad" during the 1990s that has since been discredited. Dr. Pope's testimony that the number of scientific articles on the theory has dwindled after that decade and that many recent articles criticize the validity of the theory supports that view to

some extent.[27]  (*See* 6/6/2012 Tr. at 37-43).  In response, however, plaintiff has submitted articles

from recent years that purport to support theories of repression.[28]  (*See* 6/4/2012 Tr. at 85, 89, 94,

96, 106, 110).  Given conflicting evidence regarding trends in scientific work on this issue, the

Court will not exclude testimony based merely on an apparent decline in the amount of research

in the field.

 In sum, both Dr. Hopper and Dr. Pope advocate scientific perspectives that have some

support within the field of psychiatric and psychological sciences.  For this reason, the general-

acceptance factor weighs in favor of admitting their testimony on repressed-memory theory.

### b. <u>Verifiability</u>

 Plaintiff has submitted evidence that the scientific literature on repressed-memory theory

includes a substantial number of studies that purport to provide empirical evidence of repression.

However, defendant contends that those studies are unreliable because they do not employ

objective methodologies.

 First, defendant contends that the studies that plaintiff cites rely on research subjects'

own unverified (and unverifiable) accounts of whether they were abused and later forgot about

that abuse for some period of their lives.  As Dr. Pope explained, retrospective studies in this

field employ a "do-you-remember-that-you-forgot" experimental design that yields results that

cannot be objectively verified because they concern purely mental processes.  (6/6/2012 Tr. at

134).  Even in prospective studies, where the fact of the abuse has been corroborated, there is no

way to verify that a victim's failure to report that abuse can be attributed only to repression and

---

[27] *See, e.g.*, McNally & Geraerts, *supra* note 11.

[28] *See, e.g.*, Hirokazu Kikuchi et al., *Memory Repression: Brain Mechanisms Underlying Dissociative Amnesia*, 22 J. OF COGNITIVE NEUROSCIENCE 602 (2010).

not to other psychological processes. (*Id.* at 62-64).

It certainly gives the Court pause to admit, as scientific testimony, evidence of a thesis that is supported solely by self-reported accounts of individuals' memories as they existed over the course of many years. Proponents of repressed-memory theory have argued that this concern is overstated, and that studies on the topic have evolved and developed more sophisticated methodologies to mitigate the risks inherent to self-report data.[29] Those experts have also argued that self-report data derived from reasonably well-designed studies can be scientifically valid, even if such data are imperfect.[30] Whether that is true or not, there is nevertheless legitimate cause for concern that the entire theory rests on a foundation of inherently unreliable data. Indeed, the problem of reliance on self-reported information is endemic to the fields of psychiatry and psychology generally. Nonetheless, it appears that such information is routinely relied on by experts in the field, and that on balance the appropriate course is to permit the testimony and subject it to vigorous cross-examination.

Second, defendant argues that experiments that would verify the theory can be designed, but that such experiments have not been conducted by its proponents. Dr. Pope testified that verification of memory repression would require (1) documentation of the actual abuse, (2) an interview within about a year of the abuse in which the victim fails to remember that abuse, and (3) a follow-up interview in which the interviewer confronts the person with corroborating evidence or describes the abuse to ensure that the interviewee is unable to recall the memory even when reminded of it. (*Id.* at 56-57). However, Rule 702 does not require scientific

---

[29] Brown, *supra* note 7, at 34-36; Dalenberg, *supra* note 7.

[30] Brown, *supra* note 7, at 47-48.

evidence to be based on perfect, or even the best available, methodologies. *Daubert*, 509 U.S. at 596. Dr. Hopper and Dr. Chu testified that the studies Dr. Pope criticized use methodologies that are scientifically acceptable, and proponents of repressed-memory theory have criticized Dr. Pope's proposed study as unfeasible.[29] Thus, the failure to prove repressed-memory theory using the particular experimental design that Dr. Pope proposes is likewise insufficient to require exclusion under Rule 702.

In sum, notwithstanding the methodological criticisms raised by Dr. Pope, the court finds that memory repression is a sufficiently testable and tested hypothesis to permit it to be submitted to the jury.

### 3. Relevance of the Testimony

Expert testimony on the topic of memory repression is clearly relevant to plaintiff's claim. Generally, whether expert testimony is necessary to sustain a state-law claim is determined by reference to substantive state law. *Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 27 (1st Cir. 2006). Here, plaintiff's claim is untimely unless he proves to the jury that until 2008 he lacked any conscious memory of the alleged abuse. *Creighton*, 439 Mass. at 283. Determination of whether plaintiff repressed his memory requires an understanding of scientific views as to whether it is possible for a victim to repress such memories and what characteristics persons who suffer repression might have. Such knowledge is not within the common experience of ordinary jurors. Testimony from the parties' experts will therefore provide substantial assistance to the jury in evaluating plaintiff's claims.

Dr. Hopper's testimony is therefore relevant and likely to assist the jury in assessing the

---

[29] Dalenberg, *supra* note 7, at 283-84.

factual issues in this case. Dr. Pope's testimony, in turn, is necessary to give the jury a full picture of the relevant psychiatric or psychological principles.

### E.    Application of Rule 403

The fact that the evidence survives scrutiny under Rule 702 is not the end of the inquiry. As noted, Fed. R. Evid. 403 provides that otherwise-admissible evidence may be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." In *Daubert*, the Supreme Court noted that Rule 403 may act as a backstop where expert testimony that is admissible under Rule 702 carries a risk of unduly influencing the jury:  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."  *Daubert*, 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).

Whether Rule 403 bars expert testimony on repressed-memory theory is, in some ways, a more difficult question than whether such evidence is allowed under Rule 702.  In this case, important considerations weigh on both sides of the Rule 403 balance.

The principal danger in admitting the testimony is the possibility that the jury will interpret the expert's testimony, explicitly or implicitly, as an opinion that the plaintiff is credible.  This consequence flows directly from nature of the testimony; the very purpose of offering it is to establish that plaintiff's version of events ("this happened, and I forgot about it for more than thirty years") is more credible than it otherwise might appear to be.  Put another

way, if the expert testimony does not bolster plaintiff's credibility, it has no real purpose.

A further danger is that the concept of memory repression may invite fallacious reasoning. Of course, a jury may logically credit a witness's testimony that he remembers being abused. But testimony that the witness does not remember being abused may be interpreted equally as evidence of repressed memory or as evidence of a non-existent memory. Testimony on repression might lead a juror to err by treating a person's lack of memory as affirmative evidence that the alleged abuse occurred. To state the point simply, a jury might conclude that if he remembered the abuse, that fact is proof that it occurred—and if he didn't remember it, that too is proof that it occurred, and indeed that it was so traumatic that he suppressed his memory of it.

There are other dangers, as well; for example, the jury might interpret testimony that a person's behavior is "consistent with" that of someone who has repressed memory of a traumatic experience as being testimony that the person actually experienced the phenomenon. All these risks, taken together, demand that a court exercise caution in admitting expert testimony of the kind at issue here.

However, other factors that are specific to this case weigh in favor of admission. First, the Massachusetts legislature appears to have expressly recognized the legitimacy of memory repression by enacting the discovery rule set forth in Mass. Gen. Laws ch. 260, § 4C. Indeed, the statutory text is tailored for plaintiffs whose failure to file a timely complaint was caused by the psychological effects—including memory impairment—of childhood abuse. While that legislative judgment does not affect the validity (or lack of validity) of the underlying science, it is nonetheless a factor to be weighed in the overall "fairness" assessment under Rule 403.

Second, this matter does not involve a memory "recovered" in therapy, or otherwise under more dubious circumstances. Testimony during the *Daubert* hearing made clear that therapeutic techniques may introduce false memories and that memories recovered under such circumstances are less reliable than spontaneously recovered memories. *Compare State v. King*, 2012 N.C. LEXIS 418 (June 14, 2012) (in criminal action where timeliness was not raised as an issue, affirming the exclusion of expert testimony on repressed memories that were recovered in therapy because "its probative value was outweighed by its prejudicial effect."). In such a case, the balance might tip substantially in favor of exclusion of the evidence.

Third, this is a civil, not a criminal case. For a variety of reasons, the balance under Rule 403 might well be drawn differently if the evidence were offered by the government in a criminal prosecution.

Finally, the Court is not limited to mere admission or exclusion of the evidence. The Court has the authority to give appropriate limiting and cautionary instructions, both as the testimony is admitted and at the end of the trial, to help ensure that the jury is properly focused on the issues and that they do not misinterpret the expert evidence or their duty to consider the evidence as a whole.

After careful consideration, the Court has concluded that the balance under Rule 403 tips narrowly in favor of admission. The Court finds that, under the narrow circumstances of this case, the probative value of testimony of repressed-memory theory is not substantially outweighed by its risks. However, that testimony will be subject to strict limitations. The experts may not opine as to the credibility of plaintiff's memories or as to whether the alleged abuse actually occurred, and the Court will underscore that point to the jury with appropriate

instructions and cautions.  Moreover, testimony as to the reliability of memories recovered in therapy will be excluded as irrelevant.

**IV.**     <u>**Conclusion**</u>

At trial, Dr. Hopper and Dr. Pope will be permitted—assuming, of course, that a proper factual foundation has been laid—to testify concerning memory repression theory,  its defining characteristics, and its limitations and degree of acceptance in the scientific community.  Dr. Hopper will be permitted to testify that plaintiff's reported experience is consistent with repressed-memory theory.  However, neither expert will be permitted to opine as to whether Clark suffered from the alleged abuse, whether he actually repressed any memories of the experience, or whether he is a credible witness or his claimed memory is more credible than it otherwise might appear.

For the foregoing reasons, both motions *in limine* to exclude expert testimony are DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV\_\_\_\_\_
F. Dennis Saylor IV
United States District Judge

Dated:  July 25, 2012